OPINION OF THE COURT
Joan B. Carey, J.
Introduction
Motion by defendant Stephen Bennett, M.D. for leave to reargue his prior motion which was for summary judgment dismissing the complaint insofar as asserted against him, and separate cross motions by defendants Marc Spero, M.D. and Mid-Manhattan Medical Associates, EC., Lester Nadel, M.D., and Donald Bernstein, M.D. for similar relief.
Facts and Procedural Posture
In August 1995 the plaintiffs decedent, Robert Friedman, returned to the United States following a month-long trip to Bombay, India. On September 15, 1995, the plaintiffs decedent visited his then primary care physician, defendant Donald Bernstein, M.D., an internist. The plaintiffs decedent presented at Dr. Bernstein’s office complaining of a cough that had persisted for one month and hemoptysis (i.e., coughing up blood). After performing a physical examination of the plaintiffs decedent, which revealed wheezing, and reading an unremarkable chest X ray, Dr. Bernstein diagnosed the plaintiffs decedent with bronchospastic bronchitis, for which Dr. Bernstein prescribed a bronehodilator and a cough suppressant.
The plaintiffs decedent returned to Dr. Bernstein on October 30, 1995 complaining of shortness of breath, sneezing and nasal congestion. The plaintiffs decedent’s cough had subsided as had his wheezing condition. After completing a physical examination and blood studies, Dr. Bernstein determined that the plaintiffs decedent had a viral syndrome for which Dr. Bernstein prescribed an antibiotic and referred the plaintiff’s decedent to a pulmonologist.
On November 27, 1995, the plaintiffs decedent presented to defendant pulmonologist Stephen Bennett, M.D. Dr. Bennett took the plaintiffs decedent’s medical history, and noted that he had recently been to India. Dr. Bennett also noted the plaintiffs decedent’s complaints of asthma, coughing and wheezing. A *820 physical examination revealed tachycardia (i.e., abnormally rapid heart beat). Dr. Bennett diagnosed the plaintiffs decedent with decompensated asthma (i.e., asthma attack that has been progressive or unresponsive to medication over a period of time). Immediate hospitalization for treatment with steroids and bronchodilators was suggested.
Later that day, the plaintiffs decedent was admitted, as Dr. Bernstein’s private patient with Dr. Bennett as a pulmonary consultant, to St. Vincent’s Hospital and Medical Center, a former defendant in this action. A chest X ray performed on the plaintiffs decedent indicated right midlobe pulmonary infiltrate and pneumonia. Following intravenous steroid treatment and bronchodilator therapy, the plaintiffs decedent was discharged on December 2, 1995.
The plaintiffs decedent called Dr. Bernstein on January 19, 1996 complaining of shortness of breath. Dr. Bernstein recommended immediate hospitalization, but the plaintiffs decedent decided against admission. Dr. Bernstein prescribed steroids and antibiotics, and thereafter asked the plaintiffs decedent to select another primary care physician.
On January 24, 1996, the plaintiffs decedent was seen by Dr. Bennett, who diagnosed the plaintiffs decedent with asthma, diffuse chronic sinusitis and anxiety. Dr. Bennett instructed the plaintiffs decedent to take prednisone.
On January 29, 1996, the plaintiff’s decedent, based on a referral from Dr. Bennett, began treating with a new primary care physician, defendant Lester Nadel, M.D., another internist. Based on the plaintiffs decedent’s medical history and a physical examination, Dr. Nadel assessed that the plaintiffs decedent suffered from asthma, stress and nasal polyps (i.e., relatively small growth arising from mucous membranes).
Over the course of the next 2[1]/z months, the plaintiff’s decedent called Dr. Bennett on at least four occasions complaining of, among other things, shortness of breath. Dr. Bennett, among other things, instructed the plaintiffs decedent with respect to usage of medications and encouraged the plaintiffs decedent to contact Dr. Nadel.
During the same time period, Dr. Nadel saw or spoke to the plaintiffs decedent on at least two occasions, including April 9, 1996 when the plaintiff’s decedent presented with recurrent asthma attacks accompanied by paroxysmal nocturnal dyspnea (i.e., shortness of breath occurring at night). Dr. Nadel *821 diagnosed the plaintiff’s decedent with asthma sinusitis, renewed inhalers which the plaintiffs decedent had exhausted, and instructed the plaintiffs decedent to follow up with Dr. Bennett.
By a letter dated April 15, 1996, Dr. Nadel terminated his relationship with the plaintiffs decedent. Dr. Nadel stated that he could not function as the plaintiff’s decedent’s primary care physician because the plaintiffs decedent did not consult with Dr. Nadel when the plaintiffs decedent was ill. Dr. Nadel was also concerned because the plaintiffs decedent had questioned the quality of the medical care provided by Dr. Nadel.
By a letter dated April 22, 1996, approximately one week following their last office visit, Dr. Bennett terminated his relationship with the plaintiffs decedent. Dr. Bennett did so because of the plaintiffs decedent’s threats to pursue a lawsuit against Drs. Bernstein and Nadel.
On April 26, 1996, the plaintiff’s decedent began treating with defendant Marc Spero, M.D., at his medical practice, defendant Mid-Manhattan Medical Associates, P.C. Dr. Spero diagnosed the plaintiffs decedent with eosinophilic pneumonia (i.e., disease of lungs marked by invasion of lung tissue by eosinophils) on June 3, 1996, and prednisone was prescribed to combat the illness. A bronchoscopy was performed on July 17, 1996 that confirmed Dr. Spero’s diagnosis. The plaintiff’s decedent was admitted to Lenox Hill Hospital later that day with complaints of chest pain.
On July 24, 1996, during the plaintiffs decedent’s week-long stay at Lenox Hill Hospital, Dr. Spero, based on the abnormal results of an echocardiogram, diagnosed the plaintiffs decedent with hypereosinophilic syndrome (i.e., abnormal increase in number of eosinophils in the blood). Dr. Spero prescribed a systemic steroid regimen.
The plaintiff’s decedent commenced the instant action on April 2, 1998 against Drs. Bernstein, Bennett, Nadel and Spero, as well as Dr. Spero’s medical practice (i.e., the Associates) to recover damages for medical malpractice and lack of informed consent.[1] The plaintiffs decedent’s wife asserted a derivative claim for loss of consortium. The defendants’ alleged negligence consisted of, among other things, failing to timely diagnose and *822 treat the plaintiffs decedent’s eosinophilic pneumonia. During the prenote of issue stage of this action, the plaintiffs decedent passed away as a result of cardiopulmonary dysfunction, and his wife, the administratrix of his estate, was substituted in that capacity in his place as a party to this action.
Following the completion of discovery, each of the defendants moved or cross-moved for summary judgment dismissing the complaint insofar as asserted against them. Each motion for summary judgment was supported by expert medical evidence that was to the effect that the respective movant did not depart from good and accepted medical practice, and that no act or omission by that movant was a proximate cause of the plaintiffs decedent’s injuries.
In opposition to the motions and cross motion, the plaintiff submitted, among other things, the affirmation of a licensed physician. This physician opined, among other things, that Dr. Bernstein, given the plaintiffs decedent’s complaints and his trip to India, departed from good and accepted medical practice on September 15 and October 30, 1995 by failing to incorporate eosinophilic pneumonia into the plaintiff’s decedent’s differential diagnosis. The physician also opined that the plaintiffs decedent’s complaints (e.g., coughing for one month’s duration, wheezing) and trip to India should have triggered a comprehensive work-up, including the analysis of various specified cultures and referral to various specialists, and that Dr. Bernstein’s failure to undertake these measures was a departure from good and accepted medical practice. Additionally, the plaintiffs expert stated that Dr. Bernstein was negligent in failing to prescribe a steroid therapy specifically tailored to alleviate the plaintiff’s decedent’s eosinophilic pneumonia. According to the plaintiffs expert, these alleged departures caused the plaintiffs decedent to sustain injuries in the form of advancement of the eosinophilic pneumonia, damage to the heart and lungs, substantial loss of the chance to fully recover from the ailment, and ultimately death.
The plaintiff’s expert maintained, given the plaintiff’s decedent’s complaints and his trip to India, that Dr. Bennett departed from good and accepted medical practice on November 27, 1995 by failing to incorporate eosinophilic pneumonia into the plaintiffs decedent’s differential diagnosis. The plaintiffs expert also maintained that this alleged departure caused the plaintiffs decedent to sustain injuries in the form of advancement of the eosinophilic pneumonia, damage to the heart and *823 lungs, substantial loss of the chance to fully recover from the ailment, and ultimately death.
With respect to the plaintiffs decedent’s November 1995 hospitalization, the plaintiffs expert stated that Drs. Bernstein and Bennett departed from good and accepted medical practice by failing, based upon the plaintiffs decedent’s symptoms (e.g., wheezing), his trip to India, the presence of right midlobe pulmonary infiltrate and a resident’s note listing eosinophilic pneumonia as a differential diagnosis, to rule out eosinophilic pneumonia. The plaintiffs expert also stated that this alleged departure caused the plaintiffs decedent to sustain injuries in the form of advancement of the eosinophilic pneumonia, damage to the heart and lungs, substantial loss of the chance to fully recover from the ailment, and ultimately death.
The plaintiffs expert opined that Drs. Bernstein and Bennett departed from good and accepted medical practice by failing to rule out eosinophilic pneumonia following the plaintiff’s decedent’s discharge from St. Vincent’s Hospital and Medical Center, and that their continued failure to do so exacerbated the plaintiffs decedent’s condition and hastened his death.
According to the plaintiff’s expert, based on the plaintiffs decedent’s hospitalization history, presenting symptoms and trip to India, Dr. Nadel departed from good and accepted medical practice by failing to incorporate eosinophilic pneumonia into the plaintiffs decedent’s differential diagnosis, and failing to diagnose the condition. The expert maintained that these alleged failures exacerbated the plaintiffs decedent’s condition and hastened his death.
Regarding the care provided by Dr. Spero, the plaintiff’s expert stated that the doctor failed, based upon the plaintiffs decedent’s hospitalization history, presenting symptoms and trip to India, to diagnose the pneumonia prior to June 3, 1996. The expert also stated that this alleged failure exacerbated the plaintiffs decedent’s condition and hastened his death.
By an order dated April 20, 2004, the court, among other things, denied the separate motions of Dr. Spero and the Associates, Dr. Bennett, and Dr. Nadel, and the cross motion of Dr. Bernstein finding that triable issues of fact existed regarding whether these defendants departed from good and accepted medical practice, and whether any such departures were a proximate cause of the plaintiffs decedent’s injuries.
Dr. Bennett now moves for leave to reargue his prior motion, and Dr. Spero and the Associates, Dr. Nadel, and Dr. Bernstein *824 separately cross-move for the same relief.[2] Each of the moving and cross-moving defendants assert that the court misapprehended the affirmation of the plaintiffs expert, and incorrectly determined that triable issues of fact were raised thereby regarding the defendants’ alleged malpractice. The defendants maintain that the affirmation of the plaintiffs expert is conclusory, speculative and unsupported by the medical evidence adduced on the prior motions.
The plaintiff advances two arguments in opposition tó the present motion and cross motions. First, the plaintiff asserts that each of the cross motions are untimely, and, therefore, must be denied pursuant to CPLR 2221 (d) (3). Second, the plaintiff maintains that the affirmation of her expert was sufficient to raise triable issues of fact regarding the malpractice of each of the moving and cross-moving defendants.
Analysis
Timeliness of Cross Motions
CPLR 2221 (d) (3) provides, in relevant part, that a motion for leave to reargue “shall be made within thirty days after service of a copy of the order determining the prior motion and written notice of its entry.”
Here, service of the court’s April 20, 2004 order was effected on each of the remaining parties to this action by St. Vincent’s Hospital and Medical Center of New York on June 3, 2004 when St. Vincent’s caused to be mailed to each of the parties’ attorneys a copy of the order with notice of entry thereof (see CPLR 2103 [b] [2]). The 30th day after service was July 3.[3] Pursuant to CPLR 2103 (b) (2), five days are added to this time pe *825 riod, and, thus, the remaining defendants had until July 8 to move for leave to reargue.
Dr. Bennett, having made his motion for leave to reargue on July 2 (see CPLR 2103 [b] [2]; 2211), satisfied the time requirements of CPLR 2221 (d) (3). However, the cross motions of Dr. Spero and the Associates, Dr. Nadel, and Dr. Bernstein were not served until after the July 8 deadline. Therefore, unless the cross motions are deemed to have been made at the time that the timely underlying motion for leave to reargue was made, as suggested by at least one of the cross movants, the cross motions are untimely.
A motion is made when it is served (CPLR 2211). Service of papers in a pending action by mail is deemed complete upon mailing (i.e., depositing papers enclosed in postpaid wrapper, addressed to proper person with appropriate address, in post office or official depository within the state) (CPLR 2103 [b] [2]; [f] [1]; see Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C2103:3 at 737). Therefore, where the mail is used as the method of service, a motion is made upon proper mailing of the motion papers (see Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C221L4, at 38-39; Siegel, NY Prac § 243, at 390 [3d ed]).
While the statute defining a motion delineates when the motion is deemed made, the statute authorizing a cross motion, CPLR 2215, is silent on that issue. Thus, to determine when a cross motion is deemed to be made, the nature of the application must be examined.
On one hand, a cross motion is simply part of a party’s responsive papers to a motion (see Siegel, 1993 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C2215:l, 2004 Supp Pamph, at 23). Indeed, a cross motion owes its existence to, and its procedural path is dictated by, a motion. The making of a motion enables another party to make a cross motion (see CPLR 2215). The return date, set by the movant when a notice of motion is utilized, establishes the date by which the cross motion must be served (i.e., at least three days prior to return date) (id.). Additionally, the cross motion may be supported in whole or in part by the supporting papers of the motion (id.). Ultimately, the motion and cross motion will be submitted to the appropriate judge, along with any additional papers filed on the applications, and, ordinarily, an order disposing of the lot will be issued.
However, a cross motion is an application for an order, and, thus, a species of motion (see CPLR 2211). Certain case law, *826 while not directly addressing the issue, clearly indicates that a motion and cross motion are made at different times (see e.g. Rosario v D.R. Kenyon & Son, 258 AD2d 265 [1st Dept 1999]; Glasz v Glasz, 173 AD2d 937 [3d Dept 1991]). Therefore, a cross motion is made when a notice of cross motion is served (see CPLR 2211), and the cross motions for leave to reargue in the case at bar are untimely under CPLR 2221 (d) (3).[4]
While untimely under CPLR 2221 (d) (3), the merits of the cross motion of Dr. Spero and the Associates may be considered. Prior to the 1999 amendments to CPLR 2221, the courts established the law governing the motion for leave to reargue (see e.g. 1999 Report of Advisory Comm on Civil Practice, 1999 McKinney’s Session Laws of NY, at 2065). One of these judicially-crafted rules provided that a motion for leave to reargue could not be made after the period for appealing the prior order had expired, but could lie if the movant filed a timely notice of appeal and the motion was brought prior to submission of the appeal (see e.g. Bray v Gluck, 235 AD2d 72 [3d Dept 1997]; Bermudez v New York City Hous. Auth., 199 AD2d 356 [2d Dept 1993]).
Subdivision (d) (3) of CPLR 2221, one of the aforementioned 1999 amendments (L 1999, ch 281), requires a motion for leave to reargue to be made within the time that the aggrieved party has to appeal from the prior order (i.e., within 30 days after service of copy of the order with notice of entry). No mention is made of the ability of a party to move after the time to appeal has lapsed where a timely notice of appeal is filed and the appeal has yet to be submitted. Two courts, both having dedicated considerable thought to the issue, determined that strict allegiance is to be paid to CPLR 2221 (d) (3), and that the exception to the 30-day time limit was eliminated by the amendment (see Kern v City of Rochester, 3 Misc 3d 948 [Sup Ct, Monroe County 2004, Lunn, J.]; Commissioners of State Ins. Fund v *827 Brooklyn Barber Beauty Equip. Co., 2002 NY Slip Op 50709[U] [Civ Ct, NY County 2002, Billings, J.]).
Notwithstanding these thoughtful opinions, the court comes to a different conclusion. The First Department has recently held that a motion for reargument, while “technically untimely pursuant to CPLR 2221 (d),” may be considered by the motion court (Garcia v Jesuits of Fordham, Inc., 6 AD3d 163, 165 [2004]). The Court cited Leist v Goldstein (305 AD2d 468 [2003]), a decision emanating from the Second Department in which the Court noted that a motion court may consider an untimely motion for leave to reargue made after the movant filed a notice of appeal but prior to the perfection of the appeal. The Second Department’s decision rested, in part, on Liss v Trans Auto Sys., Inc. (68 NY2d 15, 20 [1986]) in which the Court of Appeals recited the well-established rule that a court, “regardless of statutory time limits concerning motions to reargue, . . . retains continuing jurisdiction to reconsider its prior interlocutory orders during the pendency of the action” (see also e.g. Aridas v Caserta, 41 NY2d 1059 [1977]; General Elec. Real Estate Equities v Bell, 291 AD2d 313 [1st Dept 2002]). In light of Garcia v Jesuits of Fordham, Inc. (supra) and Leist v Goldstein (supra), the court agrees with Professor Siegel that a motion for leave to reargue, untimely under CPLR 2221 (d) (3), may be considered where a timely taken yet unsubmitted appeal is pending (see Siegel, NY Prac § 254, 2003-2004 Supp Pamph, at 37-38 [3d ed]; 89 Siegel’s Practice Review 2, Court Offers Tacit Indication That Motion to Reargue Continues to be Timely if Made While Appeal is Pending [Nov. 1999]; 86 Siegel’s Practice Review 1, New Law — Effective Already [and With Pitfalls] — Prescribes Practice on Motions to Reargue or Renew [Aug. 1999]). Accordingly, the cross motion of Dr. Spero and the Associates, who filed a timely notice of appeal, will be considered.
Reargument of the Prior Motions of Dr. Bennett and Dr. Spero and the Associates
On a motion for reargument, the movant must show that the court either overlooked or misapprehended relevant facts, or misapplied controlling principles of law in determining the prior application (CPLR 2221 [d] [2]; see e.g. Amato v Lord & Taylor, Inc., 10 AD3d 374 [2d Dept 2004]; 300 W. Realty Co. v City of New York, 99 AD2d 708 [1st Dept 1984]).
In the case at bar, the court did not overlook or misapprehend relevant facts, or misapply controlling principles of law in *828 determining the prior motions of Dr. Bennett and Dr. Spero and the Associates. In opposition to the prima facie showings of these defendants of entitlement to judgment as a matter of law dismissing the complaint insofar as asserted against them, the plaintiff submitted expert medical evidence establishing triable issues of fact with respect to whether these defendants departed from good and accepted medical practice in treating the plaintiffs decedent, and whether any such departures proximately caused the plaintiffs decedent’s injuries or hastened his death.
While these defendants complain that the plaintiffs expert failed to specify the signs and symptoms of eosinophilic pneumonia, it may be inferred from the averments of the plaintiffs expert that the signs and symptoms that the plaintiffs decedent exhibited during the periods he treated with each of these defendants (e.g., coughing for one month’s duration, wheezing, presence of right midlobe pulmonary infiltrate during November 1995 hospitalization) were the signs and symptoms of eosinophilic pneumonia. The disagreement between these defendants and the plaintiffs expert as to the correct signs and symptoms of eosinophilic pneumonia raises an issue of credibility to be resolved by the trier of fact (see e.g. Barbuto v Winthrop Univ. Hosp., 305 AD2d 623 [2d Dept 2003]; Halkias v OtolaryngologyFacial Plastic Surgery Assoc., P.C., 282 AD2d 650 [2001]).
Conclusion
Based upon the foregoing, it is hereby ordered that the motion of defendant Stephen Bennett, M.D. for leave to reargue his prior motion which was for summary judgment dismissing the complaint insofar as asserted against him, and the cross motion of defendants Marc Spero, M.D. and Mid-Manhattan Medical Associates, EC. for similar relief are granted, and upon reargument the court adheres to its original determination; and it is further ordered that the cross motions of defendants Lester Nadel, M.D. and Donald Bernstein, M.D. are denied as untimely.

. The action was also commenced against St. Vincent’s Hospital and Medical Center of New York, a facility at which the plaintiffs decedent received medical treatment. However, the action was dismissed insofar as asserted against this defendant by an order dated April 20, 2004.

. A cross motion is an improper vehicle for seeking relief from a nonmoving party (Mango v Long Is. Jewish-Hillside Med. Ctr., 123 AD2d 843 [2d Dept 1986]; see CPLR 2215). Dr. Spero and the Associates, Dr. Nadel, and Dr. Bernstein seek relief from the plaintiff, nonmoving party, and concomitantly mislabeled their motions as cross motions. However, where, as here, this technical defect results in no prejudice to the nonmoving party, and she is afforded ample opportunity to be heard on the merits of the relief sought, the defect will be disregarded (see Sheehan v Marshall, 9 AD3d 403 [2d Dept 2004]; Klee-berg v City of New York, 305 AD2d 549 [2d Dept 2003]; Volpe v Canfield, 237 AD2d 282 [2d Dept 1997]). Moreover, the plaintiff raised no objection to this procedural error.

. As June 3 was the day on which service was effected and is the day from which the 30-day period runs, it is excluded in computing the remaining defendants’ deadline to move for leave to reargue (see General Construction Law § 20).

. Keeley v Berley Realty Corp. (271 AD2d 299 [1st Dept 2000]) and Miranda v Devlin (260 AD2d 451 [2d Dept 1999]), cited by Dr. Spero and the Associates, and Dr. Nadel, do not warrant a different conclusion. In those matters, the Courts determined that the merits of an untimely cross motion for summary judgment should be considered where, among other things, a timely motion for summary judgment had been made and was still pending. The feature distinguishing those cases from the case at bar is that courts retain discretion pursuant to CPLR 3212 (a) to consider untimely summary judgment motions upon a showing of “good cause,” whereas no such discretion is statutorily conferred upon the courts with respect to belated motions for leave to reargue (see CPLR 2221 [d] [3]).